

B. McKay Mignault, Chief Bankruptcy Judge
United States Bankruptcy Court

**Dated: March 8th, 2024**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA
## AT BLUEFIELD

| | |
|---|---|
| IN RE:<br><br>WILDCAT MET MINING, INC.,<br><br><br><div align="center">Debtor.</div> | CASE NO. 1:22-bk-10080<br><br>CHAPTER 7<br><br><br>JUDGE B. MCKAY MIGNAULT |

## MEMORANDUM OPINION AND ORDER DENYING JOINT MOTION FOR POSTPETITION FINANCING AND CONVERTING THE CASE TO CHAPTER 7

_____

Pending before the Court are several motions, as well as certain additional briefing required by the Court's February 2, 2024 Order [dkt. 257].  First is the *Joint Motion for Entry of Order Authorizing Postpetition Financing, Granting Liens and Superpriority Administrative Expense Claim and Granting Related Relief* [dkt. 250] (the "Joint Motion"), as amended [dkt. 258] (the "Amended Joint Motion") filed by JNinvestments56, LLC ("JN").  In support of the Joint Motion and Amended Motion, JN filed a memorandum in support [dkt. 266] ("JN's Brief"), which attaches as Exhibit A, a Declaration of James Trent (the "Trent Declaration").  James Trent, President of the Debtor, also submitted a *pro se Brief in Support of Joint Motion for Postpetition Financing* [dkt. 268] (the "Trent Brief").  Objections to the Amended Motion were submitted by counsel for the United States Trustee [dkt. 264] (the "UST's Objection") and TCH Construction, LLC and Met Coal Mining, Inc. [dkt. 267] ("TCH/MCM's Objection").

Also before the Court are motions to dismiss this case filed by (1) counsel for the United States Trustee [dkt. 215] ("UST's Motion to Dismiss") and (2) TCH Construction, LLC ("TCH") and Met Coal Mining, Inc. ("MCM") [dkt. 225–26] (the "TCH/MCM Motion to Dismiss" and collectively, with the UST's Motion to Dismiss, the "Motions to Dismiss").

These are core matters regarding which this Court is vested with subject matter jurisdiction pursuant to 28 U.S.C. § 157(b) and 28 U.S.C. § 1334.

The Court held a hearing on all these matters on February 14, 2024 (the "Hearing") and previously held a hearing on the Motions to Dismiss on January 17, 2024.  Upon consideration of the parties' submissions, arguments presented at the February 14th and January 17th hearings, and the relevant law, the Court ruled that: (1) the Amended Joint Motion, as further modified at the Hearing, must be denied and (2) this bankruptcy case should be converted to Chapter 7.  A brief order converting this case to Chapter 7 and appointing Robert L. Johns as Chapter 7 Trustee was promptly entered on February 14, 2024 [dkt. 269].  This Memorandum Opinion and Order is entered to fully memorialize the Court's decision on February 14, 2024.

## I.

The story of this bankruptcy case is long and tortured.  The Debtor filed a voluntary Chapter 11 petition on December 3, 2022 (the "Petition Date").  The case was initially filed under Subchapter V of Chapter 11, but the Debtor later redesignated the case as a general Chapter 11 case [dkt. 83].

The Debtor's sole asset is a September 16, 2021 coal lease with TCH relating to mineral rights on 2,576 acres in Sand River District of McDowell County, West Virginia sometimes also referred to in pleadings as the Lower War Eagle Seam (the "Coal Lease"), which the Debtor's schedules [dkt. 22] (the "Schedules") value at $4,000,000.00.

The Schedules also disclose a few notable items. Schedule D states that the Debtor has <u>no</u> secured creditors. Schedule E/F includes only five unsecured claims:

(1) Don Salyers, President of TCH, as holding a disputed claim in an unknown amount;

(2) MCM (contract miner who is operating on the mineral tract potentially subject to the Coal Lease) as holding a $230,000.00 claim for "Funds and/or Work performed in preparation of mining 2,576 acre mineral tract located in Sand River District, McDowell County;"

(3) Neal Insurance and Consulting as holding a $120,000.00 claim incurred "on or about March 2022" for "advanced funds to satisfy initial payment amount owed by debtor to Lessor in Coal Lease dated 9/16/2021 – Debtor provided additional fund or activities incident to said lease;" and

(4) New River Engineering, Inc., as holding a $40,000.00 claim for "work performed for Debtor in preparation for mining activities."

Part 6 of the Debtor's Statement of Financial Affairs ("<u>SOFA</u>") states that Debtor's counsel, Caldwell & Riffee, was paid $10,000.00 for attorney fees <u>on the Petition Date</u>. Part 13 of the SOFA states that James Trent is the "President – <u>Sole Owner</u>" of Wildcat. However, at a hearing held January 12, 2023, the Debtor clarified that Mrs. Sandra Trent, not James Trent, is the Debtor's sole shareholder. Sandra Trent is James Trent's spouse.

On December 8, 2022, the Debtor filed a *Motion to Assume Coal Lease with TCH Construction, LLC* [dkt. 14] ("<u>Motion to Assume Coal Lease</u>"), and the Debtor later filed memoranda [dkts. 43, 109] and an addendum [dkt. 44] in support of the Motion to Assume Coal Lease. These filings asserted that the Coal Lease was not terminated under West Virginia law, and that Wildcat is in a position to commence mining and has obtained all required permits to do so. TCH filed various responses [dkts. 47, 50, 117] objecting to the Motion to Assume Coal Lease because the Coal Lease had been properly terminated prepetition.[1]

---

[1]  The Debtor filed a *Motion to Convert Contested Motion to Adversary Proceeding* [dkt. 67] on January 25, 2023, and on December 22, 2022, the Debtor filed an adversary complaint against

On January 12, 2023, the Debtor filed an Affidavit of James Trent [dkt. 58] as Chief Operating Officer of the Debtor, stating that the Debtor has not maintained financial statements or a balance sheet, but filed a 2021 tax return. The Debtor requested to retain an accountant, Lorie Meadows, to prepare monthly operating reports and complete financial projections for the Debtor at $150.00 per hour for a total anticipated cost of $1,000.00 per month. *See* Application [dkt. 28]. The Application to retain Ms. Meadows was approved on February 3, 2023. *See* Order [dkt. 95]. Although Ms. Meadows appears to have prepared operating reports for the months spanning December 2022–September 2023, no fee application has ever been submitted to pay Ms. Meadows and the monthly operating reports show no amounts owing to Ms. Meadows.[2]

On December 14, 2022, the Debtor filed an *Application to Employ Counsel* [dkt. 25] and *Affidavit of Disinterest of Joseph W. Caldwell* [dkt. 26] that did not disclose counsel's receipt of a retainer as part of his anticipated compensation. Mr. Caldwell's employment as Debtor's counsel was approved on February 3, 2023. *See* Order [dkt. 94]. Mr. Caldwell has never

---

TCH and Donald Salyers, Case No. 1:22-ap-01004. At a hearing held March 28, 2023, the Court denied the Debtor's request to resolve this contested matter through an Adversary Proceeding because (a) an adversary proceeding is not required by Rule 7001 of the Federal Rules of Bankruptcy Procedure and (b) it is more prudent to resolve this critical issue—whether the Debtor's only asset terminated prepetition—expeditiously as a contested matter. Thereafter, Case No. 1:22-ap-01004 was closed.

[2]   Indeed, the monthly operating reports submitted for every month of this case provide a "-0-" for every blank, showing $0.00 cash on hand, $0.00 paid to professionals, $0.00 expenses, etc. Although the Debtor has an operating account, bank statements were never attached to monthly operating reports as required. *See* Operating Reports filed for the months of December 2022 [dkt. 64–65], January 2023 [dkt. 107], February 2023 [dkt. 110], March 2023 [dkt. 144], April 2023 [dkt. 147], May 2023 [dkt. 154], June 2023 [dkt. 175], July 2023 [dkt. 197], August 2023 [dkt. 191], September 2023 [dkt. 195], and October 2023 [dkt. 2023]. Lorie Meadows prepared the operating reports from December 2022 through September 2023. The October 2023 operating report is purportedly signed by James Trent, by electronic signature instead of an ink signature. No operating reports were submitted for the month of November 2023 or thereafter.

4

filed a fee application in this case and has never received approval to be paid for his time in this case or to apply his fees against a retainer. The monthly operating reports submitted do not reflect that he has been paid postpetition or is owed any administrative expenses accruing after the Petition Date.[3]

On January 3, 2023, the Debtor filed a *Motion to Assume Executory Contract* [dkt. 45] ("Motion to Assume Mining Contract") requesting Court approval to assume a contract mining agreement with MCM. The Contract Mining Agreement attached to the motion was dated postpetition, on January 1, 2023, and was neither executed by the Debtor nor MCM.

In order to expeditiously resolve core questions regarding the existence of the Debtor's sole asset—the Coal Lease—the Court quickly set an evidentiary hearing on the Motion to Assume Coal Lease on February 7, 2023.

On January 18, 2023, the Debtor filed projections [dkt. 63] stating that "[i]n the event that Wildcat is permitted to assume the Lease and commence mining, it is anticipated that over the first two to four months mining will average 7,500 tons per month and thereafter increase to 10,000 tons per month and upwards. At current coal prices FOB rail car the price for metallurgical coal is approximately $150 per ton. . . ."

On January 25, 2023, MCM, TCH and the Debtor filed a *Joint Motion to Mine Coal and Make Certain Payments* [dkt. 70] (the "Joint Motion to Commence Mining"), which requested that the Court enter an order permitting mining to proceed and reasonable expenses to be paid,

---

[3]   The only professional fee application filed during the pendency of this case was for Michelle Steele, as Subchapter V Trustee, for her work prior to the redesignation of this case from Subchapter V to Chapter 11. The Court approved her application for $805 in fees on April 10, 2023 [dkt. 137]; however, if the monthly operating reports are correct, she was never paid her approved fees.

with any net profits to be held in escrow.  The Joint Motion to Commence Mining represented that "[a] detailed accounting of all expenditures will be maintained."  The Joint Motion to Commence Mining was heard on January 31, 2023, and the Court granted the requested relief.  On January 31, 2023, the Court entered the parties' proposed agreed order [dkt. 82], permitting mining to resume and requiring any net profits to be escrowed.

After the Court authorized mining to commence with net profits to be held in escrow until the dispute relating to the Coal Lease is resolved, the Court granted a continuance of the evidentiary hearing on the Motion to Assume Coal Lease and Motion to Assume Mining Contract until March 28, 2023.  *See* [dkts. 88, 98].

On March 20, 2023, the Debtor filed a *Motion to Reject Executory Contract* [dkt. 114, amended at dkt. 132] (the "Motion to Reject") seeking to reject "that certain loan/investment contract with J.N. Investments 56 LLC dated October 10, 2022."  As previously noted, this claim was listed on the Debtors' schedules as unsecured.  In the Motion to Reject, the Debtor states that the agreement appears to be signed by Mr. Trent in his individual capacity.  *See* Motion to Reject ¶ 13 [dkt. 132].  JN objected [dkts. 121, 155].

The Debtor appears to have taken some depositions in March of 2023, and the parties exchanged witness lists and exhibit lists as required prior to the March 28, 2023 evidentiary hearing.  *See* [dkts. 118–19].  At the March 28, 2023 hearing, the parties requested that the hearing on the Motion to Assume Coal Lease, Motion to Assume Mining Contract, and Motion to Reject be continued 90 days while the parties pursue mediation.  Debtor's counsel explained that a continuance would be prudent because the parties want to ensure the mine is viable and the case is economically feasible before incurring legal expenses to dispute the existence of the Coal Lease.  Additionally, Debtor's counsel stated that the parties would need a mediator with coal expertise

because the Coal Lease is short and unsophisticated, lacking key terms the parties would need to perform mining operations under the Coal Lease. For all of these reasons, the Court granted a continuance of the evidentiary hearing to July 5, 2023.

To permit breathing space for the parties to mediate, the Court also entered an Order on April 10, 2023 [dkt. 138] extending the Debtor's exclusive period to file a plan until 180 days after entry of the order, or Monday, October 9, 2023.

On April 12, 2023, an *Agreed Order Granting Motion for Mediation* [dkt. 139] was filed, signed by counsel for the Debtor, TCH/MCM, and JN, which selected Stephen Thompson as mediator and required mediation to occur within thirty (30) days from entry of the order. After reviewing his *curriculum vitae* to ensure Mr. Thompson had experience in the coal mining industry needed to assist the parties through mediation, Mr. Thompson was approved as mediator on May 22, 2023 [dkt. 149]. However, also on May 22, 2023, the parties filed a new *Agreed Order Approving Mediation* [dkt. 148] requesting that Magistrate Judge Robert W. Trumble be approved as mediator because "[t]he previously selected mediator, Stephen Thompson, disclosed a conflict of interest." Magistrate Judge Trumble was supposed to conduct the mediation on July 3, 2023, when he would be in Charleston for a Fourth Circuit Court of Appeals conference. Magistrate Judge Trumble was approved as mediator on June 5, 2023 [dkt. 151].

On June 29, 2023, a joint *Status Report* was filed indicating that "[a] mediation date was selected but by the time the Order substituting Magistrate Trumble as a mediator was entered, he had developed a scheduling conflict. Therefore, mediation has not occurred." The Status Report also stated that the parties "are willing to proceed with an evidentiary hearing" on July 5, 2023, and would be available to "further elaborate on the status of the case" at that time.

On June 30, 2023, the Debtor withdrew [dkt. 157] the Motion to Reject its agreement with JN, and TCH/MCM filed a brief Response [dkt. 161] opposing that withdrawal. Also on June 30, 2023, the Debtor filed a *Motion to Reject Executory Contract* [dkt. 159] (the "Motion to Reject Mining Contract") requesting to reject the contract mining agreement with MCM that was the subject of its previous Motion to Assume Mining Contract. TCH/MCM filed a response [dkt. 162] opposing the Motion to Reject Mining Contract on July 3, 2023.

At the July 5, 2023 hearing, Debtor's counsel reported that mining production had been "very poor" to date. The mining operations had made enough money to make payroll, but that's all—no net profits had been placed into the escrow account. The parties requested time to propose a third mediator and attempt to mediate these issues. The Court, once again, granted the parties' request for additional time, giving the parties fourteen (14) days to submit an agreed order providing for mediation. The Court also granted the Debtor's withdrawal of the Motion to Reject its agreement with JN since that contract was a contract to extend debt financing and not capable of assumption under section 365(c)(2). *See Order Permitting Withdrawal* [dkt. 168].

On July 19, 2023, the Debtor filed a *Motion to Employ Mediator* [dkt. 172], requesting approval to engage Larry Morhous as mediator. The application indicated that Mr. Morhous has more than 48 years of experience in legal practice and has been extensively involved in mediation over the past three years. On July 30, 2023, the Court entered an Agreed Order employing Mr. Morhous as mediator, which provided that "[t]he expenses of mediation shall be borne by each of the parties pro rata."[4]

On August 10, 2023, the Court entered an *Order Requiring Status Reports Regarding Mediation Efforts* [dkt. 185], requiring the Debtor to file a status report to apprise the

---

[4] The Debtor has never sought approval to compensate Mr. Morhous for his services as mediator.

Court of progress made in mediation "on September 1, 2023 and the first day of each month thereafter until mediation is complete."

On August 28, 2023, the Debtor filed a *Report to the Court* [dkt. 188] announcing that mediation was held September 16, 2021, and the parties "have successfully negotiated disputed issues regarding that certain Coal lease dated September 16, 2021." The Report promised that "[a] more detailed Agreed Order will be submitted to the Court outlining the terms of the settlement" within ten (10) days. However, the Report attached a Mediation Settlement Agreement signed by James Trent, Debtor's counsel, TCH, TCH's counsel, MCM, and MCM's counsel that provided for several handwritten terms, shown below:



When an Agreed Order providing the full settlement was not filed within ten days, the Court set a status hearing for September 20, 2023 to check in on the parties' progress

documenting their agreement.   At the status hearing, Debtor's counsel explained that the representatives for the Debtor and TCH "won't agree that today is Wednesday."  However, the parties had made progress; they were on a fifth iteration of a proposed agreed order documenting the settlement, and documentation of the settlement was described as being about 90% done.

When settlement documents were not filed within thirty (30) days, the Court scheduled another status hearing for November 15, 2023.   At the November 15, 2023 status hearing, the parties reported that they had not been able to arrive at a comprehensive settlement agreement.   The Court ordered [dkt. 200] that the parties must file comprehensive settlement documents on or before close of business on December 8, 2023; if not received, an evidentiary hearing on the Motion to Assume Coal Lease and other pending matters would be scheduled on or before December 23, 2023.

On December 7, 2023, Joseph Caldwell filed a *Motion to Withdraw as Counsel of Record* [dkts. 204, 213] because Mr. Caldwell believed that a draft Settlement Agreement dated November 29, 2023 "is consistent with all the terms of the Mediation Statement," but James Trent, the Debtor's President, "has opposed entry of the Settlement Agreement and has requested Debtor's counsel to file a formal objection to the Settlement Agreement and to request an evidentiary hearing before this Court as to whether the underlying coal lease was improperly terminated."   Further, the motion explained that Mr. Caldwell "believes that he is obligated to appear before the Court under a duty of candor and refrain from disclosing to the tribunal evidence which the lawyer knows to be false."

On December 12, 2023, the United States Trustee filed a *Motion to Dismiss* [dkt. 215] ("UST's Motion to Dismiss") seeking dismissal of the case pursuant to 11 U.S.C. § 1112(b)(4)(A), (E), (J), and (M) because (1) the Debtor has generated no income and failed to

resolve litigation since filing and, therefore, there is no reasonable likelihood of rehabilitation; (2) the Debtor has failed to comply with repeated Court orders to document the settlement; (3) the Debtor has failed to pay 3rd Quarter 2023 U.S. Trustee fees; and (4) the Debtor has failed to confirm a plan by the October 9, 2023 deadline.

On December 13, 2023, the Court approved Mr. Caldwell's request to withdraw as counsel, and the Order [dkt. 220] granting withdrawal was entered December 18, 2023.  Also on December 18, 2023, the Court entered an *Order Requiring Debtor to Secure Counsel by January 3, 2024* [dkt. 221], giving Mr. Trent until January 3, 2024 to obtain replacement counsel as required by Rule 9011-2 of this Court's Local Rules of Bankruptcy Procedure, or UST's Motion to Dismiss would likely be granted.

On December 21, 2023, TCH/MCM also filed a Motion to Dismiss [dkts. 225, 232] ("TCH/MCM's Motion to Dismiss") and memoranda in support [dkts. 227, 234].  TCH/MCM's Motion to Dismiss stated that the parties had engaged in mediation and made good faith efforts to compromise, but the Debtor refused to sign the settlement agreement.  In addition to the reasons for dismissal advanced by the UST's Motion to Dismiss, TCH/MCM asked the Court to dismiss this case because "without an enforceable settlement agreement the debtor has no assets," and the Debtor had made no offer to cure defaults under the Coal Lease, cannot cure the Coal Lease, and cannot provide adequate assurance of future performance to TCH.

On December 28, 2023, James Trent filed a request [dkt. 239] for more time to obtain counsel given delays caused by holiday schedules and health issues he experienced since the December 13, 2023 hearing.  On December 29, 2023, the Court entered an Order [dkt. 240] granting Mr. Trent an additional fourteen (14) days to obtain replacement counsel.

At the January 17, 2024 hearing, Mr. Trent had not yet obtained replacement counsel for the Debtor.  However, Andrew Nason was identified as potential counsel for the Debtor, subject to receiving both (a) a conflict waiver from JN and (b) a $10,000.00 retainer.  Mr. Trent and counsel for JN, Steven Thomas, requested that the Court further continue these matters to permit time for the Debtor to file a motion for approval of postpetition financing to fund, among other things, a retainer to engage Mr. Nason as Debtor's counsel.  Mr. Thomas represented that the Debtor's coal lease is a valuable asset, and if salvageable, a plan of reorganization might be confirmed.  Counsel for the U.S. Trustee and for TCH/MCM opposed the requested continuance. The Court entered an Order [dkt. 248] giving the Debtor until January 31, 2024 to file a motion for postpetition financing and requiring that a final hearing be held on the postpetition financing, Motion to Assume Coal Lease, and other related matters approximately fourteen (14) days thereafter.

On January 30, 2024, JN filed a *Joint Motion for Entry of Order Authorizing Postpetition Financing, Granting Liens and Superpriority Administrative Expense Claim and Granting Related Relief* [dkt. 250] (the "Joint Motion").  Upon review of the proposed financing, including a $130,000.00 "roll-up" of prepetition unsecured debt into the $230,000.00 DIP Facility (as defined in the Joint Motion), the Court determined that briefing would be required to fully evaluate and promptly act upon the Joint Motion.  On February 2, 2024, the Court entered an *Order Requiring Briefing in Support of Joint Motion for Postpetition Financing* [dkt. 257], requiring JN to submit a brief on or before February 12, 2024 addressing a variety of issues of concern to the Court.  Because Mr. Trent gave JN his consent to join in the motion, despite not having counsel to advise him or negotiate on his behalf, the motion was captioned a "Joint Motion."  The Joint Motion was only signed by counsel for JN.

The $130,000.00 roll-up originates from two separate agreements attached as Exhibit B to the Joint Motion for Postpetition Financing: (a) a "Contract for Loan/Investment and Secured Promissory Note" (the "Note") dated October 10, 2022 in the principal amount of $110,000.00 and (b) an "Addendum 1/5/23 to Contract for Loan/Investment and Secured Promissory Note" (the "Addendum") in the principal amount of $20,000. The Note was secured by the Trents' residence located at 131 Pansey Place, Princeton, WV 24739 and an assignment of 10% of all clean coal sales under the Coal Lease.

The Court had a number of concerns about these documents, including, but not limited to: (1) Part 6 of the Note states that Sandra Trent's son, Tyler Davis, was currently the Debtor's President, making it questionable whether the Note was signed by an authorized representative of the Debtor; (2) the Note was not executed by JN until after the Petition Date; (3) the Addendum was dated and executed after the Petition Date; (4) the signatures for both James and Sandra Trent were made on October 6, 2022, but were notarized on October 10, 2022; (5) the Debtor never sought Court approval to execute the Addendum postpetition, and only Sandra Trent executed the Addendum; (6) $10,000.00 of the $20,000.00 borrowed in the Addendum was specifically earmarked for Sandra Trent's "personal expenses"; and (7) $10,000.00 of the $20,000.00 borrowed in the Addendum was specifically earmarked to fund Mr. Caldwell's retainer, despite prior representations to this Court that the retainer was funded prepetition.

On February 2, 2024, JN amended the Joint Motion for Postpetition Financing [dkt. 258] ("Amended Joint Motion") to exclude $10,000.00 from the roll-up, presumably the same $10,000.00 that the Addendum clearly designated as being paid to Sandra Trent on January 5, 2023 (postpetition) for her own personal expenses. This $10,000.00 was previously excluded from JN's Proof of Claim as well and is indisputably not a claim owed by the Debtor.

13

Attached as Exhibit D to the Amended Joint Motion was a "Declaration of James Trent in Support of Joint Motion Authorizing Post Petition Financing, Granting Liens and Superpriority Administrative Expense Claim" (the "2/2/2024 Trent Declaration").  The 2/2/2024 Trent Declaration explained that $100,000.00 of the principal purportedly borrowed in the Note was funded by Jerry Neal, through his business Neal Insurance and Consulting, Inc., directly to TCH by Cashier's Check dated March 9, 2022.  *See* 2/2/2024 Trent Declaration at ⸿ 2, Exh. A. The other $10,000.00 of principal reflected in the Note was loaned "[i]n or about April 2022," it was transferred directly to Mr. Trent, and it was purportedly used "for working capital."  *See id.* ⸿ 3, Exh. B.  Mr. Trent claims that he entered into the Note on October 10, 2022 "acting on behalf of Wildcat." *See id.* ⸿ 4.  When the bankruptcy case was filed, Mr. Trent again asked Mr. Neal for a loan to fund Mr. Caldwell's $10,000.00 retainer, and on December 3, 2022, Mr. Neal wrote a $10,000.00 check directly to "Joseph Caldwell" that cleared after the Petition Date, on December 6, 2023.  *See id.* ⸿ 6, Exh. C.

On February 6, 2024, the United States Trustee objected to the Amended Joint Motion for Postpetition Financing [dkt. 264] (the "UST Objection") on the grounds that: (a) the Coal Lease was terminated prepetition and, therefore, JN has no security interest to "roll-up"; (b) the roll-up of JN's prepetition unsecured claim would improperly elevate JN's claim to superpriority administrative status and cede control of the bankruptcy estate to JN; (c) the roll-up would unlawfully permit JN to recoup $10,000.00 loaned postpetition without Court permission, which the Court cannot approve *nunc pro tunc*[5]; (d) the Debtor has not demonstrated that there are

---

[5]   *See In re Ohio Valley Amusement Co.*, No. 03-50356, 2008 Bankr. LEXIS 3191, at *22–23, 2008 WL 5062464, at *7 (Bankr. N.D.W. Va. Dec. 1, 2008) (memorandum opinion) ("Nunc pro tunc approval of a post-petition loan is not available to a party that knows court approval of the loan is necessary, but then fails to take affirmative steps to obtain that approval before loaning the money."). *E.g., Bezanson v. Indian Head National Bank et al., (In re J.L. Graphics)*, 62 B.R. 750,

no other reasonable alternatives to the proposed DIP Facility;[6] and (e) JN's contention that the

Court must defer to the sound business judgment of the Debtor is both legally inaccurate and

factually groundless where, here:

> The Debtor's failure to advance its own cause of generating income
> from its sole asset, the TCH lease, combined with its attempt to
> subvert Bankruptcy Code and policies through the proposed DIP
> Credit Agreement with JN evidences bad faith and gross abuse of
> the Chapter 11 protections and process.

*See* UST Objection at 13.

On February 12, 2024, JN submitted its court-ordered brief in support of the

Amended Joint Motion for Postpetition Financing [dkt. 266] ("JN's Brief").  JN argued that denial

of the proposed financing "would inevitably be followed by conversion of this case to one under

chapter 7, resulting in no distribution to unsecured creditors."  JN's Brief at 2.  While JN admitted

that it does not have a lien on any of the Debtor's assets, it asserted that it holds an assignment of

10% interest in clean coal sales under the Coal Lease.  JN estimates that recoverable reserves of

metallurgical coal between 1.5 million tons and 3.5 million tons; at the current market price of

$262/ton, the value of those reserves would be between $393 million and $917 million.  Given this

estimated tonnage and the market price of metallurgical coal on the Petition Date ($256/ton), JN

asserts that its $110,000.00 prepetition claim is fully secured, and rolling up this claim "has no

---

755 n.1 (Bankr. D.N.H. 1986) ("In this procedural context, in which relief is available in a matter
of days even hours if the circumstances are urgent the rationale for permitting retroactive validation
orders for secured borrowing and attachment of liens to post-petition transactions no longer
exists."), *aff'd*, 818 F.2d 1027 (1st Cir. 1987).").

[6] "Although a debtor is not required to seek credit from every possible source, *see In re Snowshoe
Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986), a debtor must show that it made a 'reasonable
effort' to obtain post-petition financing from other potential lenders on less onerous terms and that
such financing was unavailable.  *See In re Ames Dept. Stores*, 115 B.R. 34, 40 (Bankr. S.D.N.Y.
1990) (citations omitted)."  *Suntrust Bank v. Den-Mark Constr., Inc.*, 406 B.R. 683, 691 (E.D.N.C.
2009).

effect per se on the priority scheme of the Bankruptcy Code." *See* JN's Brief at 7.  JN also asserts

that:

> [B]ased on the current market price of metallurgical coal, there is no
> substantial question that the Debtor will be able to propose a plan or
> reorganization which pays all creditors in full under the DIP Credit
> Agreement within one year from confirmation, provided it is able to
> commence and continue operations in the immediate future.

JN's Brief at 4 (citing 2/12/2024 Trent Declaration at ⁋ 22).

JN's Brief asserts that the proposed DIP Facility was the only option available to

the Debtor because, "[a]s the Debtor never operated, it was not a candidate for bank financing[,]"

and "the only people who were willing to consider providing financing to the Debtor wanted 100%

of the profits."  *See* JN's Brief at 7–8.

Regarding whether the DIP Facility was the product of arm's length negotiations,

JN asserts that it is because, in agreeing to accept 50% of *net income* instead of 10% of *gross*

*income*, JN has made a "substantial concession."  Yet, JN admits:

> Undoubtedly, there is unequal bargaining power as between the
> Debtor and JN, but this does not *per se* mean that the terms of the
> DIP Credit Agreement are unconscionable.  The repayment terms
> are unusual, which is primarily a product of the fact that the parties
> were not represented by counsel in the negotiation of the original
> Note.  The repayment terms are generous, but this is tempered by
> the market opportunity available now.  If the Debtor is allowed to
> start operating and selling metallurgical coal at $262/ton, it will be
> able to propose and confirm a plan of reorganization which pays all
> creditors in full, from 50% of the net profits of the business, in less
> than one year.

*See* JN's Brief at 8 (citing 2/12/2024 Trent Declaration at ¶¶ 6–8, 22).

Attached to JN's Brief was a "Declaration of James Trent in Support of Joint

Motion Authorizing Post Petition Financing, Granting Liens and Superpriority Administrative

Claim" dated February 12, 2024 (the "2/12/2024 Trent Declaration").  In the 2/12/2024 Trent

Declaration, Mr. Trent explains his efforts to procure other sources of financing:

> Before agreeing to the DIP Loan Agreement, I approached other
> people I know in the coal industry about providing financing.
> Yajush Khanna of Legacy Mining was interested in providing
> financing, but only if I was willing to give up control of Wildcat. I
> also approached Edward Brantley, Terry Robbins and several
> others, who were interested in providing financing, if Wildcat could
> first establish that the TCH lease is still in effect.
>
> Thus, Jerry Neal and JN is the only source willing to loan money
> without giving up 100% of Wildcat, with everyone else unwilling to
> even look at this deal unless Wildcat first establishes that the TCH
> lease remains in effect.

*See* 2/12/2024 Trent Declaration ¶¶ 19–20.

On February 12, 2024, TCH/MCM filed an objection to the Amended Joint Motion

[dkt. 267] (the "TCH/MCM Objection").   The crux of TCH/MCM's Objection is that the Coal

Lease was terminated prepetition, and even if it wasn't, the proposed financing is insufficient to

cure the Debtor's breach under the Coal Lease so it could be assumed.   Additionally, TCH/MCM

argued that the roll-up of JN's prepetition unsecured claim into a postpetition superpriority

administrative claim would violate the Bankruptcy Code and disadvantage other creditors, and the

Debtor has failed to show reasonable efforts to pursue other financing options.

On February 12, 2024, James Trent filed a *pro se* "Brief in Support of Joint Motion

for Postpetition Financing" [dkt. 268] ("Trent's Brief").   Trent's Brief explained that Mr. Trent

was responsible for the generous terms of the proposed DIP Facility:

> I don't think anyone understands the risk that JN Investments (Jerry)
> took and [is] willing to take again.   Most people would have said his
> odds were better in Vegas, betting on black or red at a roulette table.
> He put the first 100,000 upon my word that we would do well at an
> old mine that had failed grossly a few years earlier.   He had also
> carried my insurance, bonds and etc. for all the mines I have
> previously owned and operated for many years.   We became friends
> during those years.   He trusted and believed in me, and that's how
> and why he loaned Wildcat Met Mining the money.
>
> The amounts of money, the interest, the 50/50 split, I was the one
> who came up with all those, JN Investments (Jerry) didn't come up

> with any of that.  Both times I approached him I told him the offer
> Im [sic] making and that it looks to good to be true.  I have him the
> terms and the interest rate that I would pay him.  Then I showed him
> the number the mines would generate.

Trent's Brief at 3.

Attached to Trent's Brief were a few documents, including a receipt reflecting payment of $500.00 in outstanding U.S. Trustee fees, Tyler Davis' September 1, 2021 resignation as officer and director of Wildcat Met Mining, Inc., and Board of Directors meeting minutes from September 1, 2021 reflecting that Tyler Davis transferred his stock to his mother, Sandra Trent, resigned as President, and James Trent would be appointed as President.  Also attached is documentation of Wildcat's issuance of 1,000 common shares of stock to Sandra Trent on September 1, 2021, signed by James Trent as President.  Trent's Brief was not signed.

On February 14, 2024, the Court held a hearing on the Amended Joint Motion.  At the outset of the hearing, counsel for JN presented two major modifications to the proposed DIP Facility—(1) it would exclude the proposed roll-up of $120,000.00 of prepetition debt and be limited to $100,000.00 in postpetition financing, and (2) instead of requiring that 100% of net profits be paid to JN until the DIP Facility is repaid, with a 50/50 split of net profits thereafter, the Debtor would pay JN set monthly payments in an amount not yet agreed upon.  JN's counsel suggested the monthly payment might be $10,000.00, but the number had not been agreed upon.  As modified orally at hearing, the Court will refer to the motion as the "Modified Amended Joint Motion."

JN's counsel also explained at the hearing that the funds would be loaned in traunches, with the first $10,000.00 being immediately funded to secure counsel for the Debtor; if the Court determines that the Coal Lease was terminated prepetition at the forthcoming March 5, 2023 evidentiary hearing, the remaining funds would not be extended to the Debtor.  Additionally,

JN's counsel asserted that if the Modified Amended Joint Motion is not approved, the Trents are willing to borrow $10,000.00 from Sandra Trent's retirement account to fund the retainer to secure replacement counsel for the Debtor.

Despite Mr. Trent's recent satisfaction of outstanding U.S. Trustee fees, counsel for the U.S. Trustee continued in its objection to the Modified Amended Joint Motion and requested that the Court dismiss the case. Counsel for the U.S. Trustee argued that splitting the DIP Facility into traunches does not overcome the deficiencies of the financing in its totality and does not relieve the Court or the U.S. Trustee from their respective obligations to ensure the proposed financing serves the best interests of the estate and does not pose an undue burden on creditors, though there are but few.

Counsel for TCH/MCM also continued in their objection to the Modified Amended Joint Motion and requested that the Court dismiss the case. TCH/MCM have been mining the premises covered by the Coal Lease for approximately the past year, but no net profits have been realized to date to be escrowed as ordered by the Court over a year ago. Counsel for TCH/MCM clarified that (a) the coal remaining for sale after cleaning is only 25% of that being mined, and (b) the going price of clean coal being mined at this time is $118.00/ton, much lower than estimated by the Debtor and JN. Counsel for TCH/MCM continued in its position that the Coal Lease was properly terminated prepetition, and even if the Coal Lease was not terminated, the proposed $100,000.00 in postpetition financing is insufficient to cure the Debtor's defaults under the Coal Lease. TCH/MCM estimates that it would take approximately $120,000.00 to cure the defaults under the Coal Lease. Additionally, TCH/MCM believes that transitioning operations at this juncture would be very expensive and difficult.

After considering these arguments, and for the reasons stated below, the Court ruled at the February 14, 2024 hearing that (a) the Modified Amended Joint Motion must be denied and (b) conversion of the case to one under Chapter 7 of the Bankruptcy Code serves the best interests of the estate. An Order [dkt. 269] converting the case to Chapter 7 and appointing Robert L. Johns as Chapter 7 Trustee was entered February 14, 2024.

## II.

### A.   The Joint Motion for Postpetition Financing, as Amended and Modified, is Denied.

As modified, the proposed DIP Facility no longer includes a "roll-up" of JN's prepetition unsecured claim. The Court finds that the proposed "roll-up" was patently unapprovable. Roll-ups are generally disfavored,[7] and this particular "roll-up" would have unquestionably elevated JN's prepetition claim (assuming the prepetition claim is against the estate) from a general unsecured claim to a superpriority administrative expense claim to the detriment of other creditors and in violation of the priority scheme of 11 U.S.C. §§ 507 and 1129(a)(9).

Even without the roll-up, the proposed DIP Facility puts the cart before the horse in this case. The Court has not yet determined whether the Debtor's only asset—the Coal Lease—was terminated prepetition or can be cured and assumed in this bankruptcy case. Without knowing

---

[7]    *See In re Caccamise*, Case No. 09-17165-SSM, 2009 BANKR. LEXIS 4174, at *10-11, 2009 WL 5205980, at *3 (Bankr. E.D. Va. Dec. 22, 2009) (noting that "roll-ups" are not favored).

that critical detail, the Court has insufficient information about the estate's prospects for reorganization to determine that the proposed DIP Facility is in the best interests of the estate.

The Court also has no evidence before it on which to conclude that the proposed financing is sufficient to fulfill one of the key purposes of the loan—to cure the Debtor's defaults under the Coal Lease so it can be assumed. The Debtor and JN have not attempted to demonstrate that the proposed $90,000.00 in financing, after satisfaction of the $10,000.00 retainer to engage replacement counsel for the Debtor, would be sufficient to cure the Debtor's defaults under the Coal Lease. Counsel for TCH/MCM estimated at the February 14, 2024 hearing that at least $120,000.00 would be needed to cure the Coal Lease.

Even if the Court had ruled that the Coal Lease was not terminated and can be assumed, it's unclear at this time whether assumption of the Coal Lease would generate sufficient revenues to fund a reorganization plan. The parties' estimates of the value of the Coal Lease are vastly different, and the Court currently has insufficient data to rely upon to value the Debtor's interest in the Coal Lease or prospects of reorganization.

Moreover, neither the Court nor parties in interest have seen the actual terms of the Modified Amended Joint Motion. As of the February 14, 2024 hearing, this modification had not been fully negotiated and papered, and even the monthly payment the Debtor would be required to pay to JN was unknown. The Court cannot approve the Modified Amended Joint Motion when the terms remain amorphous and undefined. More importantly, the source of funds the Debtor would use to make monthly payments is unknown.

The Court wholly agrees with the U.S. Trustee that the Debtor's business judgment cannot be relied upon. The fact that Mr. Trent requested that the Court approve a patently unapprovable "roll-up" to help his "friend" Jerry Neal receive preferential treatment to repay him

for his long history of making risky loans to the Trents is strong evidence that Mr. Trent is not exercising his business judgment in conformity with the Debtor's fiduciary obligations to creditors of the estate or the constraints of the Bankruptcy Code.

The Court cannot find that this transaction was entered to at arm's-length when the Debtor did not have counsel, the parties appear to be friends, and the terms are one-sided in favor of the lender. An "arm's-length transaction" is defined by Black's Law Dictionary (11th ed. 2019) as "[o]f, relating to, or involving dealings between two parties who are not related or not on close terms and who are presumed to have roughly equal bargaining power." Applying this definition, the U.S. Supreme Court has looked at whether a "transaction [is] conducted as though the two parties were strangers." *U.S. Bank Nat'l Ass'n v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 397, 138 S. Ct. 960, 968 (2018).

The Court cannot conclude that there was roughly equal bargaining power in this case. The DIP Facility was negotiated between JN's lawyer and James Trent, who hasn't had counsel in two months to advise him as to his options, the merits of the proposed DIP Financing, the Debtor's fiduciary duties to all creditors of the bankruptcy estate, or the requirements of the Bankruptcy Code and other laws. Additionally, JN's lawyer appears to have drafted all the documents, including the motions, DIP Financing loan documents, and Mr. Trent's Declarations in support of the financing. It's unknown what care Mr. Trent employed in reviewing those documents, as he did not have the advice of legal counsel in reviewing them. It's also unclear what influence or input Mr. Trent had in the final content of those documents.

The Court also cannot conclude that the parties negotiating the DIP Facility conducted themselves as strangers during negotiations. Trent's Brief details his long friendship with Mr. Neal and takes responsibility for offering overly generous terms to Mr. Neal in the DIP

Financing to honor that friendship.  There can be no doubt that the proposed DIP Facility is not a product of arm's length negotiations.

It does not appear that Mr. Trent or the Debtor, who have been two months without representation of counsel, seriously sought or considered other sources of postpetition financing.  The Court is not satisfied that the Debtor has fulfilled its obligations under 11 U.S.C. § 364 in evaluating other sources of financing or that this proposed DIP Facility is the Debtor's only or most reasonable alternative.  The 2/12/2024 Trent Declaration makes clear that a main concern to Mr. Trent in obtaining postpetition financing is to maintain 100% control of the case and the Debtor.  Thus, he was acting in his own self-interest in approaching negotiations rather than the interests of the estate.   Mr. Trent's agreement to this proposed DIP Facility appears to serve only the best interests of JN and Mr. Trent (who has personally guaranteed this debt and put up his home as security).

Although the "roll-up" is no longer part of the proposed DIP Facility, the fact that the "roll-up" was supported by Mr. Trent is illuminating in this case.  The "roll-up" presents many layers of concern in addition to those already stated.

The long lapse of time between Jerry Neal's funding of $100,000.00 in March 2022 and $10,000.00 in April 2022 and the time that the Note was signed in October 2022 raises many questions about these transactions and whether these loans were originally made to the Trents personally or to the Debtor.[8]  The $10,000.00 check written by Mr. Neal in April 2022 was made

---

[8]     Additionally, it's unclear how JN came to hold these claims when the checks were remitted by Neal Insurance and Consulting, Inc.  The only evidence of the transfer of that claim before the Court are statements made by James Trent that "[u]pon information and belief, Mr. Neal formed a limited liability company, JNinvestments56, LLC ("JN"), and transferred the debt owed by Wildcat to JN."  2/12/2024 Trent Declaration ¶ 14.

directly to James Trent, not to the Debtor, and the Court has no evidence upon which to conclude

that this $10,000.00 was used for working capital as opposed to personal expenses like the

$10,000.00 Mr. Neal loaned to the Trents in January 2023.

Upon review of the Note, the Court cannot conclude at this time that it was executed

on behalf of the Debtor.  The Note was signed by James Trent and Sandra Trent, and the signatures

do not mention Wildcat.  While there is a recital at the outset of the Note that the loan is undertaken

on behalf of Wildcat, the agreement itself states that Tyler Davis is the President; thus, the terms

of the Note itself indicate that the signatories may be unauthorized to bind Wildcat to the

Agreement.  *See* Note at ¶ 6.  Moreover, the Debtor's March 20, 2023 Motion to Reject the Note

and Addendum states that the Note appears to be signed by Mr. Trent in his individual capacity.

*See* Motion to Reject ¶ 13 [dkt. 132].

The Wildcat Board Meeting Minutes from 9/1/2021 purport to remove Tyler Davis

as President and make James Trent Wildcat's President.  However, the signatures on that document

for Mr. Davis appear similar to the handwriting of Sandra Trent and are suspect.  The Court cannot

find that this is a legitimate document at this time without further evidence.

The signatures on the Note also raise other red flags.  James and Sandra Trent

executed the Note on October 6, 2022, but the notary page for their signatures is dated four days

later, on October 10, 2022.  Jerry Neal's signature on the Note is dated January 5, 2023, after the

Petition Date.

The Proposed inclusion of the postpetition Addendum into the DIP Facility "roll-

up" is wholly inappropriate.  First, the Addendum was not signed by James Trent or any other

person on behalf of the Debtor but was executed only by Sandra Trent.  Second, the Court cannot

approve an unauthorized and undisclosed postpetition loan *nunc pro tunc*.  *See In re Ohio Valley*

*Amusement Co.*, No. 03-50356, 2008 Bankr. LEXIS 3191, at \*22–23, 2008 WL 5062464, at \*7 (Bankr. N.D.W. Va. Dec. 1, 2008) (mem. op.) ("Nunc pro tunc approval of a post-petition loan is not available to a party that knows court approval of the loan is necessary, but then fails to take affirmative steps to obtain that approval before loaning the money."); *Bezanson v. Indian Head Nat'l Bank et al., (In re J.L. Graphics)*, 62 B.R. 750, 755 n.1 (Bankr. D.N.H. 1986) ("In this procedural context, in which relief is available in a matter of days even hours if the circumstances are urgent the rationale for permitting retroactive validation orders for secured borrowing and attachment of liens to post-petition transactions no longer exists."), *aff'd*, 818 F.2d 1027 (1st Cir. 1987).

The Debtor not only failed to seek approval to enter into the Addendum but appears to have intentionally mischaracterized the retainer as a prepetition payment—(a) Part 6 of the Debtor's SOFA states that the retainer was paid <u>on the Petition Date</u>; (b) the Application to employ Mr. Caldwell did not disclose that he received a retainer [dkt. 25]; (c) all of the Debtor's monthly operating reports state that "$-0-" has been paid in professional fees since the case was filed; and (d) the Schedules fold the retainer into a $120,000.00 prepetition unsecured claim held by Neal Insurance incurred around March 2022 to "advance funds to satisfy Initial Payment Amount Owed by Debtor to lessor in Coal Lease…" [dkt. 22 p. 8].

To be clear, the Court is not ruling on the validity or effect of JN's claim at this time. These problems and issues are detailed in this order to demonstrate the unreliability of statements made and documents submitted by Mr. Trent and the Debtor when considering the adequacy of the Debtor's business judgment and management of this case.

Furthermore, the Debtor has made no progress toward reorganization since this case was filed. There has been delay after delay in the past year, with the bulk of last year being spent

on mediation, which culminated in a mediation agreement that Mr. Trent later refused to support

and fully document.   It appears that Mr. Trent is incapable or unwilling to successfully guide the

Debtor to reorganization.

In sum, the Court concludes that the proposed modifications to the DIP Facility are

insufficient to render it approvable.   The DIP Facility was not a product of arm's length

negotiations, the DIP Facility would not serve the best interests of the estate, the Debtor's business

judgment is unreliable, and the amorphous Modified Amended Joint Motion must be denied.


**B.      Cause Exists to Convert or Dismiss the Case.**

Section 1112(b)(1) of the Bankruptcy Code provides that

> [O]n request of a party in interest, and after notice and a hearing, the
> court **shall** convert a case under this chapter to a case under chapter
> 7 or dismiss a case under this chapter, whichever is in the best
> interests of creditors and the estate, for cause. . . .

11 U.S.C. § 1112(b)(1) (emphasis added).  The U.S. Trustee and TCH/MCM have met their burden

to establish a *prima facie* case that cause exists.  *See In re Sydnor*, 431 B.R. 584, 591 (Bankr. D.

Md. 2010).  The Court finds that there is ample cause to dismiss or convert this case under Section

1112(b)(4), namely the following subsections:

> (A)  substantial or continuing loss to or diminution of the estate and
> the absence of a reasonable likelihood of rehabilitation;
>
> (B)  gross mismanagement of the estate;
>
> (F)   inexcusable failure to satisfy timely any filing or reporting
> requirement established by this title or by any rule applicable to a
> case under this chapter;  and
>
> (J)   failure to file a disclosure statement or to file or confirm a plan,
> within the time fixed by this title or by order of the court.

26

It has become clear that the Debtor's case is grossly mismanaged. James Trent is the only manager disclosed for the Debtor. Mr. Trent has displayed a pattern of borrowing money from his friend, Jerry Neal, to fund his operations without following appropriate corporate formalities. Mr. Trent's main concern in proposing the DIP Facility appears to be to protect his own interests and the interests of his friend, Jerry Neal. Mr. Trent's consent to the DIP Facility and Joint Motion demonstrates that the Debtor's President and manager is not concerned with his fiduciary duties to the bankruptcy estate in this case. Rather, he's concerned with maintaining control of the company and ensuring that his friend, Jerry Neal, receives preferential treatment in this bankruptcy case.

Under the management of Mr. Trent, the Debtor has acted in blatant disregard of this Court's authority and the Bankruptcy Code in misrepresenting the nature of a postpetition debt to Sandra Trent on its schedules as a prepetition debt of Wildcat and paying bankruptcy counsel postpetition without prior Court approval. Additionally,

- The Debtor has had no counsel since December 13, 2023 despite receiving multiple continuances to obtain one. Counsel is required to proceed in Chapter 11 as a corporation pursuant to Rule 9011-2 of this Court's Local Rules.

- The Debtor is behind on monthly operating reports, with no operating reports filed since October 2023. Additionally, the monthly operating reports filed fail to include required disclosures and bank statements for the Debtor.

- The Debtor has never filed a plan of reorganization, despite receiving an extension of the exclusive period until October 9, 2023.

- The Debtor's efforts toward mediation, which took the majority of last year, were not reasonable. The first approved mediator turned out to have a conflict after being retained. The second approved mediator never conducted a mediation due to a scheduling conflict. The third approved mediator did conduct a mediation, but the result was a hand-written, one-page list of terms that the parties, in the end,

could not memorialize in a comprehensive settlement agreement.

- Once mediation failed, counsel for the Debtor withdrew in December and has not been replaced.

- This case has no reasonable prospect for reorganization under current management.

To overcome dismissal or conversion, Section 1112(b)(2) requires that the Debtor show three things:

1. that, due to "unusual circumstances," dismissal or conversion is not in the best interests of creditors and the estate;

2. that there is a reasonable likelihood that a plan will be confirmed within a reasonable time; and

3. that the grounds for dismissing or converting the case include an act or omission other than those in section 1112(b)(4)(A) for which there exists a reasonable justification and that can be cured within a reasonable time.

11 U.S.C. § 1112(b)(2). The Debtor has been given notice of the Motions to Dismiss and has had an opportunity to respond and be heard. However, the Debtor has not demonstrated unusual circumstances that conversion or dismissal is not in the best interest of creditors or that there is a reasonable likelihood that a plan will be confirmed within a reasonable time. Additionally, the Court has found that "cause" includes acts and omissions without any reasonable justification.

## C.     Conversion to Chapter 7 Serves the Best Interests of the Estate.

Having found that there is ample "cause" to convert or dismiss this case pursuant to 11 U.S.C. § 1112(b), the Court is required to either dismiss or convert this case depending on which alternative, in the Court's view, "is in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(1). The best interest of creditors is served by the course of action that results in

the largest number of creditors being paid the largest amount of money in the shortest amount of time; the best interest of the estate, on the other hand, focuses on whether the economic value of the estate is greater in or out of bankruptcy. *See In re Del Monico*, Case No. 04-28235, 2005 WL 1129774, at *3, 2005 Bankr. LEXIS 840, at *9 (Bankr. N.D. Ill. May 13, 2005); *In re Rey,* Case Nos. 04-35040, 04-22548, 06-4487, 2006 WL 2457435, at *9, 2006 Bankr. LEXIS 1803, at *25 (Bankr. N.D. Ill. Aug. 21, 2006) ("The best interest of the estate turns on whether the economic value of the estate is greater in or out of bankruptcy").

Despite the fact that the Debtor does not, and has never, had any operations, JN and Mr. Trent speculate that the Debtor may be entitled to hundreds of millions of dollars in coal sales that could fund a reorganization. The Court cannot determine whether that speculation is correct in this Chapter 11 case without holding an extensive evidentiary hearing; however, the Debtor still has no counsel.

In a conversion scenario, the Chapter 7 Trustee can investigate this unusual situation and issue a report to the Court regarding whether he believes there are assets in this case. In light of the consistent mismanagement of the Debtor and the irreconcilable opinions of the parties regarding the assumability and value of the Debtor's coal lease, the best thing to do is to appoint a Chapter 7 Trustee to objectively evaluate the situation and determine whether or not this case has sufficient assets to pay its creditors. Conversion is in the best interests of the estate because a Trustee can objectively evaluate the merits of the parties' arguments with respect to the Coal Lease, the mediation agreement, the various claims against the estate, and bring this case to a sensible conclusion. Conversion will also best serve creditors because more creditors will be paid more money more quickly through the guiding hand of a neutral Chapter 7 Trustee.

## III.

Accordingly, **IT IS ORDERED** that the

1.  The Joint Motion be and hereby is **DENIED**; and

2.  The Motions to Dismiss filed by the U.S. Trustee and TCH/MCM are
    **GRANTED IN PART AND DENIED IN PART** insofar as the Court agrees
    that it must dismiss or convert this case pursuant to 11 U.S.C. § 1112(A), (B),
    (F), and (J), but has determined that conversion to Chapter 7 serves the best
    interests of the estate.  To the extent not granted herein, the Motions to Dismiss
    are denied.

**IT IS SO ORDERED.**